AUSAs: William Kinder, Rebecca Delfiner

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **25 MAG 1667** |
| UNITED STATES OF AMERICA<br><br>                v.<br><br>PATRICK ALLEN,<br><br>                      Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1343,<br>1956(a)(1)(B)(i), and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

      DANIEL ONOVE II, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

## COUNT ONE
### (Wire Fraud)

      1.    From at least in or about March 2021 through at least in or about May 2025, in the Southern District of New York and elsewhere, PATRICK ALLEN, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ALLEN engaged in a scheme to make and to cause to be made false statements to victim investors to fraudulently obtain investor funds, and sent and received, and caused others to send and receive, emails, telephone calls, wire transfers of funds, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

      (Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Money Laundering)

      2.    From at least in or about March 2021 through at least in or about May 2025, in the Southern District of New York and elsewhere, PATRICK ALLEN, the defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud charged in Count One of this Complaint, in violation of Title 18, United States Code, Section 1343, knowing that

the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(1)(B)(i).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special Agent with the FBI. I have been personally involved in the investigation of this matter, and I base this complaint on that experience, on my examination of various reports and records, and on my conversations with witnesses. Because this complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. Based on my participation in this investigation, my conversations with witnesses and victims, and my review of law enforcement records, bank records, investment documents, and other records obtained during this investigation, I have learned the following about an investor fraud scheme perpetrated by PATRICK ALLEN, the defendant.

*The Participants in the Fraud*

5. As further set forth below, based on my participation in this investigation, my conversations with witnesses, victims, and other law enforcement officers, and my review of publicly available materials, I have learned, among other things, the following:

   a. Company 1 is a purported financial solutions firm which connects investors with investment opportunities.

   b. Investment Adviser 1 is a purported asset management firm.

6. Based on my review of records received from the Division of Corporations at the Delaware Department of State, and bank records received from a bank, I have learned, among other things, the following:

   a. The AEA HBCU Grant Fund is a corporation registered in the state of Delaware. On bank account opening documentation with the bank, PATRICK ALLEN, the defendant, is listed as the President of the AEA HBCU Grant Fund. AEA HBCU Grant Fund's bank account was opened on or about May 6, 2024.

   b. On bank account opening documentation with the bank, ALLEN is also listed as the President of the AEA HBCU Fund Inc. AEA HBCU Fund Inc.'s bank account was opened on or about September 16, 2022.

   c. One Leaf LP is a limited partnership registered in the State of Delaware, for which the general partners are PBL & 5J Holdings, Inc., the AEA HBCU Fund, Inc., and the AEA HBCU Grant Fund, Inc., with PATRICK ALLEN, the defendant, listed as the President of all three general partners. One Leaf LP was created on or about May 2, 2024.

2

7.  Based on my review of records received from the Florida Department of Revenue and my conversations with other law enforcement officers, I know, among other things, that Compass Fuel & Oil, Inc. ("Compass"), is a Florida corporation that was incorporated in or about February 2019, with PATRICK ALLEN, the defendant, named as the Vice President of Compass.

8.  Based on my review of records received from a bank and my conversations with other law enforcement officers, I know, among other things, that PBL & 5JS Holdings, Inc. ("PBL & 5JS") is a Delaware Corporation formed in October 2018. PATRICK ALLEN, the defendant, is listed in bank account opening paperwork as the President of PBL & 5JS.

*The First Tranche*

9.  The First Tranche of PATRICK ALLEN, the defendant's, investment fraud scheme involved at least nine victims who together invested approximately $2.4 million to be traded by ALLEN through Compass. Company 1 was the intermediary between the investors and ALLEN. At least one of the investors, Victim 1, understood that the investment Victim 1 made, approximately $500,000, would be returned to Victim 1 in four to six weeks, after which Victim 1 would continue to receive a portion of profits from ongoing trading. Additionally, at least 16 investors had previously invested money with ALLEN; while the at least 16 early investors in the scheme had some or all of their investments returned to them, the approximately nine later investors, including Victim 1, received neither their investments nor any profits from their investments.

10. Based on my review of bank records, and my conversations with witnesses, including Victim 1 and Victim 2, and other law enforcement officers, I know, among other things, the following:

a.  Between on or about March 2021 and June 2021, at least 16 investors invested approximately $3.4 million[1] with Compass. Victim 2 was one of those early investors. Most of those investors or investment groups had their investments returned, in whole or in part, but they did not receive any profits.

b.  Prior to Victim 2's investing, Company 1 made representations to Victim 2, including that Company 1 had done business with Compass in the past, and that prior investments were always profitable and always provided returns on schedule.

c.  On or about May 14, 2021, Victim 2 invested approximately $100,000 with ALLEN. On or about June 24, 2021, Victim 2's $100,000 investment was returned, without any profits.

d.  On or about June 15, 2021, Victim 3 wired approximately $1,000,000 to a bank account in the name of Compass; Victim 3's investment was not returned in whole or in part.

---

[1] Based on my review of bank records, I know, among other things, that certain of these purported investments were sent to Compass in Euros rather than in U.S. Dollars, thus the total amount invested varies depending on the exchange rate used in the calculation.

3

   e. Between on or about June 28, 2021 and on or about September 23, 2021, at least nine investors or investment groups, including Victim 1 and Victim 2, deposited approximately $2,464,000 into an IOLTA account for a particular lawyer (the "Lawyer").  Between on or about July 12, 2021 and October 6, 2021, approximately that same sum was transferred from the Lawyer's IOLTA account to a bank account in the name of Compass, with PATRICK ALLEN, the defendant, as the sole signatory, and an account number ending in 8480 (the "8480 Account"). The 8480 Account was opened by ALLEN on or about June 17, 2021, less than a month before the first victim funds were deposited in the account.

   f. Prior to Victim 1's investing, Company 1 made representations to Victim 1, both directly and indirectly, that the investors in the scheme would receive their investments back in four to six weeks, and would then receive a portion of the profits generated by the trading.  Victim 1 understood the investment was a private placement funding.

   g. On or about June 17, 2021, Victim 1 invested approximately $500,000 with an intermediary who intended to invest Victim 1's money with ALLEN. Victim 1's investment reached the Lawyer's IOLTA account on or about September 28, 2021.  Victim 1 understood the investment would go through a law office in New York.

   h. On or about September 16, 2021, Victim 2 invested approximately $250,000 as Victim 2's second investment with ALLEN.

  11. Based on my conversations with Victim 1, and my review of reports from other law enforcement agents, I know, among other things, that the representations from Company 1 that Victim 1 would receive Victim 1's investment back in four to six weeks, and would receive significant profits, were relevant to Victim 1's decision to invest.

  12. Based on my conversations with Victim 2, and my review of reports from other law enforcement agents, I know, among other things, that Company 1's representations about their past dealings with Compass were relevant to Victim 2's decision to invest Victim 2's money with Compass.

  13. Based on my conversations with witnesses, including Victim 1, my review of records received from witnesses, including Victim 1 and Victim 2, and my conversations with other law enforcement officers, I know, among other things, the following:

   a. Victim 1's investment was not returned within four to six weeks. Victim 1 first understood that Company 1 had and was trading Victim 1 and others' investments, then came to learn that PATRICK ALLEN, the defendant, was in fact trading the investment through his entity, Compass. Victim 1 never spoke directly to ALLEN.

   b. From at least in or about January 2022 through at least on or about August 2022, Victim 1 spoke and emailed regularly with Company 1 about the return of the investment.

   c. On or about August 11, 2022, Victim 1 received a letter from ALLEN, sent via email from Company 1, which stated that some of the reasons for the very long delays in repayment were "Covid-19, the effect of world financial matters due to Russia/Europe, banking changes that have are [sic] being implemented, etc."

   d. As set forth above, Victim 2's first investment of $100,000 was returned after some delays. Victim 2's second investment of $250,000 was not returned. Victim 2 communicated with Company 1 about the return of the investment, and Company 1 told Victim 2 that there were delays due to Britain exiting the European Union and due to funds being locked up in the Cayman Islands.

   14. Based on my review of bank records and my conversations with other law enforcement officers, I know, among other things, that by the time PATRICK ALLEN, the defendant, told Victim 1 that Victim 1's investment was delayed in August 2022, ALLEN had already spent all of Victim 1's funds on non-investment expenses.

   15. Based on my review of bank records, records provided by the businesses where PATRICK ALLEN, the defendant, spent victim funds, as well as those businesses' websites, and my conversations with other law enforcement officers, I know, among other things, the following:

   a. Between on or about July 12, 2021 and on or about October 6, 2021, ALLEN received approximately $2,464,000 of investor funds in the 8480 Account. Of that, approximately $295,000 was transferred into five different bank accounts, three in the name of Compass Fuel & Oil and two in the name of PBL & 5JS, all of which had ALLEN as the sole signatory. Two of those accounts were opened on June 17, 2021, two were opened on July 9, 2021, and one was opened on October 8, 2021, after many of ALLEN's victims had already made their investments.

   b. Of the investor funds received into the 8480 Account, none appears to have been used for investment purposes. For example, approximately $323,249 was sent to a sheriff's office, approximately $171,400 was sent to an event marketing and logistics company, approximately $15,000 was sent to a real estate rental agency, approximately $180,000 was sent to a private jet subscription service, approximately $20,225 was sent to a sports ring company, and approximately $600,000 was sent to a tax preparer.

   16. Based on my review of records provided by the sheriff's office, and my conversations with witnesses, including other law enforcement officers, I know, among other things, that PATRICK ALLEN, the defendant's, payment of approximately $323,249 to the sheriff's office was partial satisfaction of a judgment that had been lodged against the Lawyer, relating to the Lawyer's partial ownership of a house.

*The Second Tranche*

   17. The Second Tranche of the fraud scheme involved at least one victim, Victim 4, whom Company 1 introduced to Investment Adviser 1 and to PATRICK ALLEN, the defendant. Company 1 told Victim 4 that a $1 million investment with Investment Adviser 1, which would then be traded by ALLEN, would be returned after six weeks, and then Victim 4 would receive approximately $55,205,750 in profits over the following 12 months. Victim 4 invested $1 million dollars in approximately April 2022, and has not received either the investment or any profits back. ALLEN spent Victim 4's money primarily on personal expenses, as set forth below.

   18. Based on my participation in this investigation, my review of documents provided by Victim 4, and my discussions with witnesses, including Victim 4, I know, among other things, the following:

5

a. On or about April 21, 2022, Victim 4 invested $1 million after having conversations about the investment with representatives of Company 1. Company 1 told Victim 4 that the $1 million investment would be used as a line of credit, which would be returned in full after 6-8 weeks, after which Victim 4 would receive a huge return each month.

b. Victim 4 signed three contracts with Company 1 and one contract with PATRICK ALLEN, the defendant. Company 1's contracts with Victim 4 were styled as a joint venture agreement, dated April 19, 2022, a non-disclosure agreement, dated April 19, 2022, and an escrow agreement dated April 18, 2022. As shown below, the joint venture agreement between Victim 4 and Company 1 stated that Victim 4's funds would be quarantined for the duration of a program such as a "bullet program," and then entered into a 40-week program with weekly or monthly profits:

> and the investment contract having been accepted and signed by the JV and the PRIVATE PLACEMENT PROGRAM REPRESENTATIVE, shall be quarantined for a period be determined by private placement program (such as bullet program / short term and/or long-term programs). If the *VENTURER* so chooses, then the asset amount described previously (Detail in Point 2.7) will be entered into a 40-week program with a determined weekly or monthly yield will be determined by the Private Placement Program. This shall to all Rolls and Extensions as well as the initial contracts with any Private Placement Program.

c. Victim 4's contract with ALLEN included representations that (i) ALLEN (listed in the contract as "PBL") would not "for any reason, use, deplete, move or transfer any of the funds," and (ii) Victim 4 would receive Victim 4's full $1 million back at the end of the sixth week after the investment was made.

d. Additionally, as shown below, Victim 4's contract with ALLEN included a representation that ALLEN "has agreed to place the referenced funds into PBL's Program to earn profits for the benefit of [Victim 4]."

> PBL has agreed to place the referenced funds into PBL's Program to earn profits for the benefit of **RMM**; and
>
> Now therefore, the Parties enter into this Agreement under the following terms, conditions and procedures to effectively access said Program(s):
>
> ARTICLE 1.    SCOPE AND DESCRIPTION
>
> 1.1. The purpose of this Agreement is to invest funds in the transactional account, using the funds sent to said Account into financial private commercial transaction(s); and

f. An appendix to the contract between Victim 4 and ALLEN listed the total payments to be made to Victim 4 over 12 months as $55,205,750.

6

19. Based on my conversations with Victim 4, I know, among other things, that the representations that Victim 4 would receive Victim 4's investment back, and would also receive large returns, were relevant to Victim 4's decision to invest with PATRICK ALLEN, the defendant.

20. Based on my participation in this investigation, my review of financial records provided by various financial institutions, and my discussions with witnesses, including Victim 4, I know the following, among other things, regarding money sent by Victim 4 to Investment Adviser 1:

   a. On or about April 21, 2022, Victim 4 wired approximately $1 million to a bank account in the name of Investment Adviser 1 with an account number ending in 3581 (the "3581 Account"). Prior to this transfer, the 3581 Account had a $0 balance, meaning that the only money in the 3581 Account was Victim 4's money.

   b. On or about May 3, 2022, approximately $1 million was transferred from the 3581 Account to a capital markets account (the "Capital Markets Account") in the name of Investment Adviser 1. After the transfer, the balance in the 3581 Account was $0, and the balance in the Capital Markets Account was approximately $1 million, meaning that the only money in the Capital Markets Account was Victim 4's money.

   c. On or about May 31, 2022, approximately $200,000 from the Capital Markets Account (Victim 4's money) was used to purchase U.S. Treasury bills, which remained in the Capital Markets Account. Between on or about July 28, 2022, and August 30, 2022, those U.S. Treasury bills were liquidated. In July of 2022, the Capital Markets Account purchased approximately $207,000 of securities and sold approximately $87,000 of securities. In August of 2022, the Capital Markets Account purchased approximately $139,000 of securities and sold approximately $111,000 of securities. In summary, a portion of the cash in the Capital Markets Account was utilized to purchase various securities through the Capital Markets Account.

   d. Between on or about June 7, 2022, and on or about September 27, 2022, approximately $614,679 of Victim 4's money was transferred out of the Capital Markets Account and deposited into a bank account in the name of Investment Adviser 1, with an account number ending in 3727 (the "3727 Account"). Prior to on or about June 7, 2022, the 3727 Account had a balance of $0, meaning that the only money in the 3727 Account after June 7, 2022 was Victim 4's money.

   e. Between on or about June 8, 2022 and July 1, 2022, approximately $105,900 was transferred out of the 3727 Account and into a bank account in the name of PBL & 5JS, with PATRICK ALLEN, the defendant, as the sole signatory, with an account number ending in 6093 (the "6093 Account"). Prior to the wire transfer on June 8, 2022, the 6093 Account had a balance of approximately $3.15, meaning that essentially all of the money in the 6093 Account after that point was Victim 4's money.

21. Based on my participation in this investigation and my review of bank records, I know, among other things, that:

7

a. Between on or about June 8, 2022 and July 5, 2022, approximately $45,450 was moved from the 6093 Account, which was controlled by PATRICK ALLEN, the defendant, in the name of PBL & 5JS, to two other bank accounts also controlled by ALLEN, each in the name of Compass. One was the same 8480 Account used by ALLEN in the First Tranche; the other was an account with an account number ending in 2578 (the "2578 Account"). Prior to receiving Victim 4's money in June 2022, the 2578 Account had a negative balance (due to an overdraft charge), and the 8480 Account had a balance of approximately $403.77, meaning that essentially all of the money in the 2578 Account and the 8480 Account after that point was Victim 4's money.

b. Between on or about June 8, 2022 and July 5, 2022, approximately $36,600 was moved from the 6093 Account to a different bank account controlled by ALLEN in the name of PBL & 5JS, with an account number ending in 6051 (the "6051 Account"). Prior to receiving Victim 4's money in June 2022, the 6051 Account had a balance of approximately $4.38, meaning that essentially all of the money in the 6051 Account after that point was Victim 4's money.

c. The Victim 4 funds in the 2578 Account, the 8480 Account, and the 6051 Account, all with ALLEN as the sole signatory, were spent on personal expenses, including approximately $1,600 withdrawn in cash, approximately $2,803 spent on flights and hotels, approximately $7,051 spent on peer-to-peer transactions, including through various phone applications, approximately $4,649 spent on tickets to professional sports events, and approximately $5,671 spent through a website that permits users to buy tickets for live events.

22. Based on my review of publicly available records, law enforcement databases, and my conversations with other law enforcement officers, I know that the bank where PATRICK ALLEN, the defendant, opened approximately nine bank accounts which received victim funds in the First and Second Tranches of the scheme, has its headquarters in the Southern District of New York.

23. Based on my participation in this investigation, my review of bank records and my conversations with witnesses, including Victim 4, I know, among other things, that this spending was not consistent with the representations in the investment contract between PATRICK ALLEN and Victim 4.

24. Based on my participation in this investigation, my review of documents provided by Victim 4, and my conversations with witnesses, including Victim 4, I know, among other things, the following regarding Victim 4's attempts to get Victim 4's money back:

a. In approximately early June 2022, approximately 6 weeks after sending Investment Adviser 1 approximately $1 million, Victim 4 did not receive Victim 4's investment money back.

b. On or about August 15, 2022, Victim 4 emailed PATRICK ALLEN, the defendant, representatives of Company 1, and copied an attorney, requesting the return of Victim 4's $1 million. After receiving no response, on or about August 20, 2022, Victim 4 emailed the same group again requesting a timeline for the return of the capital, and Victim 4 followed up again on or about August 24, 2022.

c. On or about December 7, 2022, the attorney for Victim 4 sent a demand letter to ALLEN demanding the return of Victim 4's $1 million investment and $6 million of promised net

8

distributions. Victim 4 did not receive either the $1 million investment or the $6 million of distributions.

  d. On or about January 2024, Victim 4, was given ALLEN's phone number by a representative of Company 1, and at the direction and under the supervision of law enforcement, began texting directly with ALLEN about the return of Victim 4's money.

  e. Between on or about March 4, 2024 and on or about March 15, 2024, Victim 4, at the direction and under the supervision of law enforcement, frequently contacted ALLEN in an attempt to find out when, if ever, Victim 4's money would be returned, and ALLEN repeatedly strung Victim 4 along. For example, on or about March 4, 2024, Victim 4 exchanged text messages with ALLEN about the status of the investment. At that time, ALLEN stated to Victim 4 that he "just ha[d] some final ends to tie up" and that the delay was caused by "tax paperwork and clearances." A few days later, however, Victim 4 again exchanged text messages with ALLEN about the status of the investment. ALLEN conveyed to Victim 4 that the delay in returning the money was due variously to "a hold" on the account, and the fact that "the available balance and the account balance are drastically different."

  25. Based on my review of bank records, I know, among other things, that at the time PATRICK ALLEN, the defendant, told Victim 4 that he "just [had] some final ends to tie up" and "hopefully the funds will finally come available," in early 2024, ALLEN had already spent all of the approximately $105,900 of Victim 4's money that he had received (the remainder of Victim 4's $1 million investment having sat in the 3727 Account in the name of Investment Adviser 1).

  26. Based on my participation in this investigation and my conversations with Victim 4 and other law enforcement officers, I know, among other things, that Victim 4 was present in the Southern District of New York while texting with PATRICK ALLEN, the defendant, about the status of Victim 4's investment.

  27. Based on my participation in this investigation and my conversations with Victim 4, I know, among other things, that, to date, Victim 4 has not received the return of any of Victim 4's approximately $1 million or any profits derived therefrom.

*The Third Tranche*

  28. The Third Tranche of the scheme involved at least one victim, Victim 5, whom PATRICK ALLEN, the defendant, induced to invest approximately $410,000 in mid-2024. ALLEN promised Victim 5 that Victim 5 could get the investment back at any time, and that the investment would generate large profits. Victim 5 invested approximately $410,000 over three transfers of funds, and ALLEN spent Victim 5's money on personal expenses, including donations to historically black colleges and universities ("HBCUs"), cash withdrawals, jewelry, food, and travel. Victim 5 requested the return of the investment, and to date has received nothing back from ALLEN.

  29. Based on my participation in this investigation, my review of bank records from various financial institutions, and my conversations with Victim 5, I know, among other things, the following:

a.  On or about December 2023, Victim 5 received approximately $1.4 million as a settlement from a lawsuit. A personal friend of Victim 5 ("Individual-1") encouraged Victim 5 to invest the settlement money with PATRICK ALLEN, the defendant, representing to Victim 5 that ALLEN was involved with a non-profit entity called "AEA Fund," which was connected with HBCUs.

b.  Individual-1, Victim 5's personal friend, told Victim 5 that an initial $30,000 investment with ALLEN would turn into $90,000 in two to three months as a result of ALLEN's trading in the AEA Fund.

c.  Individual-1 also introduced Victim 5 to ALLEN by telephone. ALLEN told Victim 5 that he founded the "AEA Fund" to help students, and that by investing with him Victim 5 would be helping students. ALLEN told Victim 5 that investing with him would make money for both ALLEN and Victim 5. Victim 5 planned to use the returns on the investment to improve Victim 5's housing situation, and to make donations to a charitable organization.

d.  Individual 1 told Victim 5 that ALLEN could return Victim 5's funds at any time.

e.  ALLEN's representation to Victim 5 that investing with ALLEN would make money for Victim 5 was relevant to Victim 5's decision to invest with ALLEN.

f.  On or about April 22, 2024, ALLEN executed a contract in the name of "AEA HBCU Fund" with a business run by a friend of Individual-1 (the "Business"), which contract Individual-1 then emailed to Victim 5, telling Victim 5 that it was the agreement for the project. The contract stated that "Profits can be withdrawn as per wish of the Parties."

g.  Between on or about April 19, 2024 and on or about June 4, 2024, Victim 5 transferred money that Victim 5 intended be used for Victim 5's investment with the AEA Fund. Specifically:

i.  On or about April 19, 2024, Victim 5 deposited a cashier's check for approximately $30,000 with the Business, with the intention that the $30,000 be sent on to ALLEN.  Individual-1 had told Victim 5 that both the Business and ALLEN's fund were non-profit organizations, which would facilitate the investment.  On or about April 24, 2024, the $30,000 was wired to an account ending in 1666 in the name of the AEA HBCU Fund, Inc., with ALLEN as the only signatory (the "1666 Account").

ii.  After Victim 5's initial investment of approximately $30,000, both Individual-1 and ALLEN pressured Victim 5 to invest more money with ALLEN.  At the same time, ALLEN was already spending Victim 5's money on non-investment expenses.

iii.  On or about May 1, 2024, Victim 5 deposited a cashier's check for another approximately $30,000 with the Business. The approximately $30,000 was then wired to the 1666 Account on or about May 3, 2024.  By the time that Victim 5's second $30,000 entered the 1666 Account, ALLEN had already spent approximately $19,000 of Victim 5's first investment on non-investment expenses.

10

     iv. On or about April 29, 2024, Victim 5 deposited a cashier's check for approximately $250,000 with the Business. The approximately $250,000 was then wired to the 1666 Account on or about May 10, 2024. By the time the approximately $250,000 entered the 1666 Account, there was only approximately $5,000 left in the 1666 Account, meaning that ALLEN had already spent approximately $55,000 of Victim 5's money.

     v. On or about June 4, 2024, Victim 5 wired approximately $100,000 directly from Victim 5's bank account to the 1666 Account. Prior to the wire transfers beginning on or about April 24, 2024, the 1666 Account had a balance of approximately $5, and the 1666 Account had only minimal other transactions during this period, meaning that essentially all of the money in the 1666 Account after that point was Victim 5's money.

     vi. After sending the approximately $410,000 to ALLEN, Victim 5 decided to stop participating in the investment. When Victim 5 told Individual-1 that Victim 5 wanted the money back, Individual-1 told Victim 5 to call ALLEN directly.

     vii. Victim 5 called ALLEN repeatedly to request the return of Victim 5's investment, but ALLEN never answered the phone. Victim 5 left ALLEN voicemails requesting the return of Victim 5's investment.

  30. Based on my review of bank records received from various financial institutions, records from mobile payment applications, business records from various entities, and my conversations with other law enforcement officers, I know, among other things, that from the 1666 Account, Victim 5's funds were sent to at least eight other bank accounts, all controlled by PATRICK ALLEN, the defendant, and ultimately spent on non-investment uses. For example:

  a. Between on or about April 25, 2024 and on or about May 10, 2024, approximately $17,600 of Victim 5's funds were transferred from the 1666 Account to an account ending in 8828 in the name of the AEA HBCU Fund, Inc., with ALLEN as the sole signatory (the "8828 Account"). Prior to the transfer of Victim 5's funds, the 8828 Account had a negative balance, meaning that all of the money in the 8828 Account was Victim 5's money.

  b. From the 8828 Account, ALLEN moved Victim 5's funds to another bank account in ALLEN's own name, moved Victim 5's funds to another bank account in the name of the AEA HBCU Fund Inc., spent approximately $1,358 on utility payments, and wrote approximately $6,000 in checks. ALLEN also sent approximately $1,724 to a university.

  c. Between on or about May 7, 2024 and May 17, 2024, approximately $75,000 of Victim 5's funds were transferred from the 1666 Account to an entity that appears to own a professional sports team.

  d. Between on or about May 20, 2024 and June 21, 2024, approximately $29,000 was moved from the 1666 Account to three different accounts in the name of One Leaf LP, with ALLEN as the sole signatory. As described above, One Leaf LP is a limited partnership registered by ALLEN on or about May 2, 2024, with PBL & 5JS Holdings, Inc., the AEA HBCU Fund, Inc., and the AEA HBCU Grant Fund, Inc. as its general partners.

11

   e. Two of the bank accounts in One Leaf LP's name were opened on or about May 6, 2024; the third was opened on or about June 10, 2024. Prior to the transfer of Victim 5's funds, two of the One Leaf LP bank accounts had a balance of approximately $100, and the third One Leaf LP bank account had a balance of approximately $500, meaning the vast majority of the funds in the One Leaf LP bank accounts were Victim 5's money.

   f. Victim 5's funds in the three One Leaf LP bank accounts were used for non-investment purposes, including retail spending. For example, on or about June 7, 2024, ALLEN spent approximately $1,283 dollars of Victim 5's money at Walmart.

   g. Between on or about May 14, 2024 and on or about June 10, 2024, $125,000 was moved from the 1666 Account to an account ending in 1250 in the name of the AEA HBCU Grant Fund, with ALLEN as the sole signatory, which account was also opened on May 6, 2024 (the 1250 Account). Prior to receiving the $125,000 wire from the 1666 Account, the 1250 Account had a balance of approximately $100, meaning that essentially all of the money in the 1250 Account was Victim 5's money.

   h. From the 1250 Account, approximately $5,125 of Victim 5's money was sent to one of the One Leap LP bank accounts, more than $50,000 was sent to the Internal Revenue Service and Intuit, approximately $13,500 was withdrawn in cash, and approximately $41,800 was sent to another account ending in 1242 in the name of AEA HBCU Grant Fund, also opened on May 6, 2024, with ALLEN as the sole signatory (the "1242 Account"). Prior to receiving the $41,800 from the 1666 Account, the 1242 Account had a balance of approximately $100, and had no prior transactions, meaning that essentially all of the money in the 1242 Account was Victim 5's money.

   i. Of the approximately $41,800 of Victim 5's funds which were sent to the 1242 Account, approximately $1,241 was spent on food, approximately $5,000 was spent on retail spending, approximately $8,480 was sent via mobile payment applications, and approximately $3,000 was withdrawn in cash, among other non-investment spending.

  31. Based on my review of bank records and my conversations with other law enforcement officers, I know, among other things, that a small proportion of Victim 5's money did end up going to various colleges, including HBCUs, however Victim 5 received no profits from the investment.

  32. Based on my conversations with Victim 5, I know, among other things, that Victim 5 was living in the Bronx, New York, the entire time that Victim 5 was in communication, including over the phone, with PATRICK ALLEN, the defendant.

  33. Based on my participation in the investigation, my discussions with Victim 5, and my review of files extracted from Victim 5's cellular phone, I know, among other things, that Victim 5 has not had any investment funds returned.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of PATRICK ALLEN, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_Daniel Onove II (by VF with permission)_
DANIEL ONOVE II
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), pursuant to Federal Rule of Criminal Procedure 4.1,
this  16  day of May, 2025.

_____
THE HONORABLE VALERIE FIGUEREDO
United States Magistrate Judge
Southern District of New York

13